## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 17-148 |
| NATHANIEL PAGAN | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Nathaniel Pagan terrorized women in order to exploit them for his own financial gain.   Pagan attacked women with whips, shot them with a BB gun, and beat them, leaving permanent physical and emotional scars.   Pursuant to the defendant's plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C), the government submits that a guidelines sentence of 228 months' (19 years') imprisonment is the appropriate sentence in this case.

I.    **PROCEDURAL BACKGROUND**

On March 23, 2017, Pagan was charged by Indictment with three counts of sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591 and 1594.   On May 24, 2018, Pagan pled guilty to all three counts pursuant to a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C).   The parties recommended the following sentence: at least 180 months' imprisonment to no greater than 228 months' imprisonment, a mandatory minimum five years' supervised release up to lifetime supervised release at the discretion of the Court, a fine at the discretion of the Court, and $15,300 in special assessments.   Pagan is scheduled to be sentenced on June 24, 2019.

1

II.     **FACTUAL BACKGROUND**:

From June 2016 to December 2016, Nathanial Pagan operated as a violent "pimp."   He used threats of violence, violence, and manipulation to force women to engage in sex acts for his financial benefit.   He kept women hostages and refused to allow them to leave.

On two occasions, in November 2016, a man referred to here as Person #1, ordered a woman for a sexual encounter using the online prostitution website Backpage.com.   Presentence Report ("PSR") ¶ 12.   Person #1 reported that the first time "Cinderella," later identified as C.O., arrived at his apartment, after the purchased time period had elapsed, Pagan knocked on Person #1's door and told C.O. to "hurry up."   *Id.*   On the second occasion Person #1 ordered another woman for a sexual encounter; again, "Cinderella" arrived.   *Id.* ¶ 13.   After they completed a sex act, C.O. told Person #1 that her pimp was beating her and taking her money, and she showed him her visible black eye where she had been punched.   *Id.*   During this conversation, Pagan and another large male pounded at the apartment door.   Person #1 opened the door, Pagan pulled C.O. out of the apartment, and then he and the other male burst in and started physically assaulting Person #1.   A neighbor called the police and Pagan left, taking C.O. with him, before law enforcement arrived.

Based on this report, law enforcement initiated an undercover operation, found the name "Cinderella" advertised on Backpage.com, and scheduled a sexual encounter.   *Id.* ¶ 14. Arrangements were made for an "in-call" at an area hotel.   Several text messages were exchanged between the undercover ("UC") and someone using (484) 202-0969 (later identified as Pagan's mobile telephone number), and an arrangement was made for $160 for a half hour for later that day.   *Id.*   Throughout the day, the UC was contacted by a different phone number and a woman's

voice said she was running late.   *Id.*   At around 8:40 p.m., a taxicab arrived at the hotel, and C.O. got out while Pagan waited in the taxi.   *Id.*

C.O. went to the hotel room where the UC was waiting.   *Id.* ¶ 15.   She identified herself as "Cinderella."   *Id.*   The UC handed her $160, a team of law enforcement officers then entered the room, and C.O. was arrested.   *Id.*   The only thing in C.O.'s possession was a single condom. *Id.*   After C.O.'s arrest, the UC reported she was smiling and appeared relieved.   C.O. stated she had been waiting for someone to help her to get away from Pagan.   *Id.*

C.O. reported to law enforcement the following:   Several weeks before, she met Pagan, and he forced her into prostitution.   *Id.*   Pagan would never leave her alone and coordinated all dates himself from his phone.   *Id.*   Typically, he transported her and then waited outside.   *Id.*   If the time limit elapsed, he would knock and sometimes assault her or the sex buyer.   *Id.*   She had to give him all the money that she was paid.   *Id.*   She had an obvious black eye, which Pagan gave her in an assault.   *Id.*   She had been threatened and assaulted by Pagan on several occasions. *Id.*   She had no cash or belongings on her and had no phone.   *Id.*   Pagan told her if she ever tried to leave or call the police he would beat her.   *Id.*   During one incident, she described being at "Klein's Motel" and Pagan assaulting her.   *Id.*   C.O. tried calling a family member to come pick her up at a nearby gas station, and tried to leave the room on three separate occasions; each time Pagan prevented her from doing so by blocking her path or physically restraining her.   *Id.*

After the 30 minutes that the UC had scheduled elapsed, law enforcement observed Pagan exit the cab and approached the hotel room door.   *Id.* ¶ 16.   He began knocking on the door looking for "Cinderella,"   *Id.*   He was then detained by law enforcement.   *Id.*   He was read his *Miranda* rights, and while he agreed to speak, he was evasive and lied.   *Id.*   He provided a false

name and stated the "girl" was his friend and she asked him to come with her to the hotel.   Law enforcement later identified him by fingerprint analysis as Nathanial Pagan.   *Id.*   Officers recovered from Pagan a clear plastic bag of K2, 11 small zip lock bags containing marijuana, 6 foil wrapped packages containing marijuana, and a black digital scale with residue.   *Id.*

Through the investigation, other women were identified as victims.   *Id.* ¶ 17.   One woman, L.P. reported the following:   She met Pagan at a party around June of 2016, felt they "hit it off," and exchanged phone numbers.   *Id.*   The first time she went to his house, Pagan's friend invited her inside and then upstairs to see Pagan.   *Id.*   Pagan was in the process of "bagging up" marijuana and K2 for sale.   *Id.*   L.P. originally believed her relationship started with Pagan as boyfriend/girlfriend having consensual sex.   *Id.*   After she had been with him for about 2-3 weeks, Pagan suggested she could make money by doing "dates," *i.e.,* commercial sexual acts. *Id.*   Pagan told her they would split the money.   *Id.*   L.P. stated there was another girl at Pagan's home referred to as "Crystal" (identified as A.P. below) whom Pagan called his "ho."   *Id.*   L.P. went on a "date" arranged by Pagan but then decided not to go through with it.   *Id.*   He then brought her to a hotel in Allentown where A.P. was working and had A.P. give her pointers on how to do the business.   *Id.*   At some point, L.P. agreed to do her first commercial sexual act. *Id.*   She made approximately $120 and asked Pagan for half; he refused.   *Id.*   When she was with the sex buyer, Pagan kept all of her belongings to ensure she came back when it was over.   *Id.* From that point forward, Pagan kept her belongings and all the money she made.   *Id.*   She was never allowed out of his sight and he set up numerous sexual encounters for her whether she wanted to or not.   *Id.*   L.P. reported that Pagan or one of his friends always transported her and waited for the sex act to be over.   Pagan forced L.P. to continue to do prostitution dates despite

her telling him that she did not want to.   *Id.*

L.P. reported that during one incident, she became sick from smoking K2 in the car because she had not eaten anything and threw up.   *Id.*   Pagan began yelling and hitting her and she got out of the car and started walking away.   *Id.*   Pagan got out and physically forced her back inside the car and told her if she ever tried to leave, he would hunt her down and bring her back and beat her.   *Id.*   She said the beatings then became a regular occurrence.   *Id.*   She reported there was a period of about six weeks when he took her and another girl to various hotels in the York, Pennsylvania area, and would beat both of them mercilessly.   *Id.*   On several occasions, Pagan whipped L.P. with electrical cords and shot her over a dozen times at close range with a BB gun. *Id.*   L.P. has many whip scars over her back and BB scars over her body.   *Id.*   L.P. reported she engaged in approximately 200-300 commercial sex acts for Pagan during the three months she was with him and made somewhere around $20,000, all of which she was forced to give him.   *Id.*

L.P. was able to escape with the help of Pagan's mother.   *Id.* ¶ 18.   L.P. and another girl were at Pagan's mother's residence and Pagan stepped out for a short time.   *Id.*   Pagan's mother used that time to call L.P.'s stepfather to come pick her up.   *Id.*   She told L.P. to hurry up and go. *Id.*   L.P. literally ran outside to where her stepfather and brother were waiting in car and jumped in; Pagan returned at this exact time and attempted to get L.P. back – he was tugging at the car doors and there was a heated exchanged between the family and Pagan.   *Id.*   L.P. managed to escape with the help of her stepfather and brother.   *Id.*

A third victim, A.P. reported the following:   She met Pagan around June of 2016 when she was walking on 10th Street in Reading.   *Id.* ¶ 19.   She explained that he called out to her from his house and she went to sit on the front porch with him.   *Id.*   After talking for a while,

Pagan took her down to the basement of his house to smoke marijuana.   *Id.*   While there with

Pagan, he told A.P. that he could take care of her and they could make money together.   *Id.*   A.P.

explained that she began prostituting for Pagan around the end of June 2016 to sometime in July

of 2016 – she estimated it was 3-4 weeks.   *Id.*   A.P. explained that she had used heroin in the

past but that she had been clean for 10-11 months prior to meeting Pagan.   *Id.*   She explained

that Pagan began giving her heroin and using that as her form of payment for prostituting.   *Id.*

She stated that Pagan took pictures of her, posted advertisements on Backpage.com, and conducted

all communication with any sex buyers.   *Id.*   A.P. stated that Pagan set the prices for the

prostitution encounters as $60 for a short stay (15 minutes), $100 for a half hour, and $150 for an

hour.   *Id.*   A.P. stated that she thought that she would be receiving half of the money that she

earned through the prostitution encounters, but that Pagan took all of the money, would

occasionally give her $5-$10 to get some food, and would provide her with some heroin.   *Id.*

A.P. explained that she observed Pagan hit L.P. and another girl, a juvenile, on numerous

occasions, and saw him shoot them with a BB gun.   *Id.*   She stated that the violence was

prompted by not doing something that he said or talking back to him.   *Id.*   A.P. stated that she

did not feel like she could leave because she was afraid of being hurt, because Pagan took all of

her belongings and identification and never left her unsupervised.   *Id.*   When Pagan was

arrested, he had A.P.'s identification in his wallet.   *Id.*

A juvenile witness, S.M., was interviewed and stated the following:   S.M. met Pagan

when she was 15 and they began a relationship.   *Id.* ¶ 20.   Pagan would give her drugs like K2

and marijuana and they would smoke together.   *Id.*   S.M. stayed with Pagan wherever he stayed,

sometimes at his house and sometimes in hotel rooms. *Id.* S.M. said that there were other girls

around who were prostituting for Pagan. *Id.* S.M. stated that Pagan was violent with her on numerous occasions and would hit her, whip her with cords, and shoot her with a BB gun. *Id.* S.M. explained that on one occasion he forced her to shoot L.P. with the BB gun or face violence herself. *Id.* S.M. explained that the violence occurred when someone did not listen to Pagan or do what he said or talked back to him. *Id.* S.M. also stated that Pagan had her take some pictures of the other girls and communicate with prostitution customers. C.O. confirmed the juvenile took pictures of her. *Id.* C.O. also observed Pagan assault the juvenile on numerous occasions.

II.   **SENTENCING CALCULATION**.

    A.   **Statutory Minimum and Maximum Sentence.**

The charges of conviction carry the following statutory minimum and maximum sentences: on each of Counts One through Three, lifetime imprisonment, a mandatory minimum 15 years' imprisonment, a $250,000 fine, a mandatory five years' supervised release up to lifetime-supervised release, a $100 special assessment, and if found to not be indigent, an additional $5,000 special assessment pursuant to 18 U.S.C. § 3014.

Total maximum and mandatory minimum punishment:   Lifetime imprisonment, a mandatory minimum 15 years' imprisonment, a mandatory minimum five years' supervised release up to lifetime-supervised release, a $750,000 fine, and if found to not be indigent, $15,000 in special assessments pursuant to 18 U.S.C. § 3014.   Full restitution shall also be ordered.

    B.   **Sentencing Guidelines Calculation.**

The government agrees with the sentencing guideline calculation in the PSR. Pursuant to USSG § 3D1.1, each count represents a separate harm as each involved a separate

victim.   Therefore, there are three groups.

<u>Group 1 – Sex Trafficking by Force, Fraud, or Coercion of L.P.</u>

| | |
|---|---|
| Base Offense Level – USSG § 2G1.1: | 34 |
| Use of Minor – USSG § 3B1.4: | +2 |
| Adjusted Offense Level: | 36 |

<u>Group 2 – Sex Trafficking by Force, Fraud, or Coercion of A.P.</u>

| | |
|---|---|
| Base Offense Level – USSG § 2G1.1: | 34 |
| Use of Minor – USSG § 3B1.4: | +2 |
| Adjusted Offense Level: | 36 |

<u>Group 3 – Sex Trafficking by Force, Fraud, or Coercion of C.O.</u>

| | |
|---|---|
| Base Offense Level – USSG § 2G1.1: | 34 |
| Use of Minor – USSG § 3B1.4: | +2 |
| Adjusted Offense Level: | 36 |

<u>Group 4 – Sex Trafficking by Force, Fraud, or Coercion of S.M.</u>

| | |
|---|---|
| Base Offense Level – USSG § 2G1.1: | 34 |
| Use of Minor – USSG § 3B1.4: | +2 |
| Adjusted Offense Level: | 36 |

<u>Multiple Count Adjustment:</u>

| Group | Adjusted Offense Level | Units |
|---|---|---|
| 1 – Count 1 | 36 | 1 |
| 2 – Count 2 | 36 | 1 |
| 3 – Count 3 | 36 | 1 |

| | | |
|---|---|---|
| 4 – Count 4 | 36 | 1 |
| | | |
| Total Number of Units | | 4 |
| Greater of the Adjusted Offense Levels: | | 36 |
| Increase In Offense Level: | | +4 |
| Combined Adjusted Offense Level: | | 40 |
| Acceptance of Responsibility: | | -3 |
| Total Offense Level: | | 37 |
| Criminal History Category II | | |
| Applicable Guideline Range: | | 235-293 months |

III.   **ANALYSIS**.

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence is 228 months' imprisonment as agreed by the parties, which is a guideline range sentence.

The Supreme Court has declared:   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."   Gall v. United States, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a).   Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3)

the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.   18 U.S.C. § 3553(a).

A.    **Nature and Circumstances of the Offense**:

To say Pagan's criminal behavior is serious is an understatement.   At only 18 years of age, Pagan terrorized women and forced them into prostitution.   Pagan lured all three victims by pretending to initiate a friendship or a relationship.   He then used threats and violence to force them to sell their bodies for his own financial benefit.   Pagan shot both L.P. and A.M. with a BB gun and whipped L.P. with electrical cords.   L.P. has whip scars on her back and BB scars on her body.   All victims were held against their will and threatened with violence if they should try to leave.

Pagan has left permanent emotional and physical scars on his victims.   The impact of his crimes is devastating.

B.    **History and Characteristics of the Defendant**.

While defendant has had significant contact with law enforcement, he has one juvenile adjudication for simple assault and resisting arrest for striking another with a broomstick.   Pagan initially received probation, but after numerous probation violations, he was sent to Abraxis, a placement for juvenile delinquents.

As a very young adult, Pagan squeezed a lifetime of horrific criminal conduct into a few months.   Despite his age, he is a dangerous individual who has demonstrated zero capacity for empathy or basic human decency.   Berks County Children & Youth records provided to the government by Pagan's counsel document a troubled childhood filled with Pagan's rage and angry outbursts, including physically assaulting his mother and attempting to stab her.   In these records, Pagan was described as becoming explosively unmanageable.

**C.     The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

The Court should impose a sentence to reflect the heinous crimes the defendant committed against women.   The recommended term of 228 months' imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."   § 3553(a)(2).

**D.     The need to afford adequate deterrence to criminal conduct, and to protect the public for further crimes of the defendant.**

This grotesque crime of profiting from the sale of women must be deterred.   The sentence should send a message to others that the brutal sex trafficking of others will not be tolerated.   The recommended sentence of 19 years is necessary to deter Pagan and others from the exploitation of others for their personal financial gain.   A 19-year sentence will also protect the community from Pagan's acts of violence for as long as he remains incarcerated.

**E.     The need to provide the defendant with education or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ."   § 3553(a)(2)(D).   In fact, defendant would be served well to develop

11

marketable skills while incarcerated.

**F.    The guidelines and policy statements issued by the Sentencing Commission**

As stated above, the Supreme Court has declared:   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."   *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

## V.    RESTITUTION

Title 18, United States Code, Section 1593 requires mandatory restitution to victims of sex trafficking for the "full amount of the victim's losses."   Section 1593(b)(3) states that "the victim's losses" are defined by Section 2259(b)(3), and shall additional include the value of the victim's services to the defendant or the value of the victims labor under the Fair Labor Standard Act, whichever is greater.   18 U.S.C. § 1593(b)(3).

Section 1593 requires the restitution award to account for the value of the victims' services to the defendant.   18 U.S.C. § 1593(b)(3).   As set forth below, the government has reviewed the statements of the victims to determine the estimated number of commercial sexual encounters engaged in by each victim leading to a total estimated value of victims' services that the defendant secured.   Pagan set all the prices for the sexual encounters and received all the money.

C.O. stated she engaged in approximately 25-30 commercial sexual encounters for Pagan. Depending on the length of the sexual encounter, Pagan charged either $160 for a half hour or $200 for a full hour.   A conservative estimate of what C.O. earned is calculated for 25 encounters for $160 – for a total of $4,000.

L.P. stated that she engaged in between 200 and 300 commercial sexual encounters for Pagan.   Once, again, depending on the length of the sexual encounter, he charged either $160 for a half hour or $200 for a full hour.    A conservative estimate of what L.P. earned is calculated for 200 encounters for $160 – for a total of $32,000.

A.P stated that she engaged in approximately 30 – 40 commercial sexual encounters for Pagan.   Once again, depending on the length of the sexual encounter, he charged either $160 for a half hour or $200 for a full hour.    A conservative estimate of what A.P. earned is calculated at 30 encounters for $160 – for a total of $4,800.

VI.   **CONCLUSION**

Pagan's actions were simply egregious.    He has demonstrated that he is devoid of any basic humanity.   Pagan has earned the jointly recommended 228-month sentence for his brutal crimes.


Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney



_/s/ Sherri A. Stephan_____
Sherri A. Stephan
Assistant United States Attorney

Dated:   June 17, 2019

## **CERTIFICATE OF SERVICE**

I certify that a copy of this sentencing memorandum was caused to be served by Sherri A.

Stephan, Assistant United States Attorney, by electronic filing upon defense counsel:


Rossman Thompson, Esquire
Federal Court Division The Curtis Center Building
601 Walnut Street
Suite 540 West
Independence Square West
Philadelphia, PA 19106


____/s/ Sherri A. Stephan_____
Sherri A. Stephan
Assistant United States Attorney


Date:   June 17, 2019